# EXHIBIT A

# EXHIBIT A

STATE OF NORTH CAROLINA

COUNTY OF DURHAM

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
File No. _____

R
E
C
E
I
V
E
D
JUL 11 2012

NNN Durham Office Portfolio 1, LLC;
James Osmond; NNN Durham Office
Portfolio 2, LLC; James Sun Yu Lam;
NNN Durham Office Portfolio 3, LLC;
Gary F. Turtle; NNN Durham Office
Portfolio 4, LLC; Sherry L. Turtle;
NNN Durham Office Portfolio 5, LLC;
Gregory R. Maloney; NNN Durham
Office Portfolio 6, LLC; Sharon I.
Maloney; NNN Durham Office Portfolio
7, LLC; Jack Miller, Trustee; Patricia M.
Miller, Trustee; NNN Durham Office
Portfolio 9, LLC; PCL Property, LLC;
NNN Durham Office Portfolio 10, LLC;
Frances H. Kieffer, Trustee; NNN Durham
Office Portfolio 11, LLC; Frank A.
Norman, Jr.; NNN Durham Office
Portfolio 12, LLC; St. Kitts
Investments, LLC.; NNN Durham
Office Portfolio 13, LLC; Fannie B.
Blackwelder; NNN Durham Office
Portfolio 14, LLC; Samuel Davidson,
Trustee; NNN Durham Office Portfolio
15, LLC ; Frederick J. Hornbacher, Trustee;
NNN Durham Office Portfolio 16, LLC;
Roberta MacGregor Masson, Trustee;
NNN Durham Office Portfolio 17, LLC;
William B. Wachter II, Trustee;
NNN Durham Office Portfolio 18, LLC;
Susan B. Wachter, Trustee; NNN Durham
Office Portfolio 19, LLC; Pell/Cruz
Investments, Inc.; NNN Durham Office
Portfolio 20, LLC; Jack R. Brown;
NNN Durham Office Portfolio 21, LLC;
Patricia A. Brown; NNN Durham Office
Portfolio 22, LLC; Jack D. LaFlesch,
Trustee; NNN Durham Office Portfolio
24, LLC; Muriel Sample, Successor Trustee;
James K. Merrill, Successor Trustee;
NNN Durham Office Portfolio 26, LLC;
C.G.B.M.T Enterprises, Inc.; NNN Durham

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

COMPLAINT

(Jury Trial Demanded)

Office Portfolio 27, LLC; Susan E. Wagner;              )
NNN Durham Office Portfolio 28, LLC;                    )
Federic J. Van Dis; NNN Durham Office                   )
Portfolio 29, LLC; Lawrence A. Wattson,                 )
Trustee; Stephanie T. Wattson, Trustee;                 )
NNN Durham Office Portfolio 30, LLC;                    )
Darrin A. Smith; NNN Durham Office                      )
Portfolio 32, LLC; Kenneth Deno McLamb;                 )
NNN Durham Office Portfolio 33, LLC;                    )
Cynthia L. McLamb; NNN Durham Office                    )
Portfolio 34, LLC; Mark B. Pista;                       )
Carol E. Pista,                                         )
                                                        )
                  Plaintiffs,                           )
                                                        )
                        v.                              )
                                                        )
Highwoods Realty Limited Partnership;                   )
Highwoods DLF 98/29, LLC;                               )
Highwoods DLF, LLC; Highwoods                           )
Properties, Inc.; Grubb & Ellis|Thomas                 )
Linderman Graham; Thomas Linderman                      )
Graham, Inc.,                                           )
                                                        )
                  Defendants.                           )
                                                        )

NOW COME the Plaintiffs by and through their undersigned counsel and file this Complaint

against Defendants, alleging and saying as follows:

## I. PARTIES

1.

The Plaintiffs, NNN Durham Office Portfolio 1, LLC, NNN Durham Office Portfolio 2, LLC,

NNN Durham Office Portfolio 3, LLC, NNN Durham Office Portfolio 4, LLC, NNN Durham Office

Portfolio 5, LLC, NNN Durham Office Portfolio 6, LLC, NNN Durham Office Portfolio 7, LLC,

NNN Durham Office Portfolio 9, LLC, NNN Durham Office Portfolio 10, LLC, NNN Durham

Office Portfolio 11, LLC, NNN Durham Office Portfolio 12, LLC, NNN Durham Office Portfolio

2

13, LLC, NNN Durham Office Portfolio 14, LLC, NNN Durham Office Portfolio 15, LLC, NNN Durham Office Portfolio 16, LLC, NNN Durham Office Portfolio 17, LLC, NNN Durham Office Portfolio 18, LLC, NNN Durham Office Portfolio 19, LLC, NNN Durham Office Portfolio 20, LLC, NNN Durham Office Portfolio 21, LLC, NNN Durham Office Portfolio 22, LLC, NNN Durham Office Portfolio 23, LLC, NNN Durham Office Portfolio 24, LLC, NNN Durham Office Portfolio 26, LLC, NNN Durham Office Portfolio 27, LLC, NNN Durham Office Portfolio 28, LLC, NNN Durham Office Portfolio 29, LLC, NNN Durham Office Portfolio 30, LLC, NNN Durham Office Portfolio 32, LLC, NNN Durham Office Portfolio 33, LLC, and NNN Durham Office Portfolio 34, LLC are all Delaware corporations which are properly registered with the North Carolina Secretary of State.

2.

The plaintiff, James Osmond, is a natural person, and is the sole member of NNN Durham Office Portfolio 1, LLC.

3.

The plaintiff, James Sun Yu Lam, is a natural person, and is the sole member of NNN Durham Office Portfolio 2, LLC.

4.

The plaintiff, Gary F. Turtle, is a natural person, and is the sole member of NNN Durham Office Portfolio 3, LLC.

5.

The plaintiff, Sherry L. Turtle, is a natural person, and is the sole member of NNN Durham Office Portfolio 4, LLC.

3

6.

The plaintiff, Gregory R. Maloney, is a natural person, and is the sole member of NNN Durham Office Portfolio 5, LLC.

7.

The plaintiff, Sharon I. Maloney, is a natural person, and is the sole member of NNN Durham Office Portfolio 6, LLC.

8.

The plaintiffs Jack and Patricia Miller are trustees of the Ray and Patricia M. Miller Trust, and appear in their representative capacities for said trust, which is the sole member of NNN Durham Office Portfolio 7, LLC.

9.

The plaintiff, PCL Property, LLC, is a Minnesota limited liability company, and is the sole member of NNN Durham Office Portfolio 9, LLC.

10.

The plaintiff, Frances H. Kieffer, is a trustee for the Frances H. Kieffer 2000 Trust, and appears in that representative capacity for said trust, which is the sole member of NNN Durham Office Portfolio 10, LLC.

11.

The plaintiff, Frank A. Norman, Jr., is a natural person, and is the sole member of NNN Durham Office Portfolio 11, LLC.

4

12.

The plaintiff, St. Kitts Investments, LLC, is a California limited liability company which is the sole member of NNN Durham Office Portfolio 12, LLC.

13.

The plaintiff, Fannie B. Blackwelder, is a natural person, and is the sole member of NNN Durham Office Portfolio 13, LLC.

14.

The plaintiff, Samuel Davidson, is a trustee for the Revocable Living Trust of Barbara L. Davidson, and appears in his representative capacity for said trust, which trust is the sole member of NNN Durham Office Portfolio 14, LLC.

15.

The plaintiff, Frederick J. Hornbacher, is a trustee for the Frederick J. Hornbacher Living Trust, and appears in his representative capacity for said trust, which is the sole member of NNN Durham Office Portfolio 15, LLC.

16.

The plaintiff, Roberta MacGregor Masson, is a trustee for the Roberta MacGregor Masson 2005 Trust, and appears in her representative capacity for the trust, which is the sole member of NNN Durham Office Portfolio 16, LLC.

17.

The plaintiff, William B. Wachter II, is a trustee for the William B. Wachter II Trust, and appears in his representative capacity for said trust, which is the sole member of NNN Durham Office Portfolio 17, LLC.

5

18.

The plaintiff, Susan B. Wachter, is a trustee for the Susan B. Wachter Trust, and appears in her representative capacity for said trust, which is the sole member of NNN Durham Office Portfolio 18, LLC.

19.

The plaintiff, Pell/Cruz Investments, Inc., is a Florida corporation which is the sole member of NNN Durham Office Portfolio 19, LLC.

20.

The plaintiff, Jack R. Brown, is a natural person, and is the sole member of NNN Durham Office Portfolio 20, LLC.

21.

The plaintiff, Patricia A. Brown, is a natural person, and is the sole member of NNN Durham Office Portfolio 21, LLC.

22.

The plaintiff, Jack D. LaFlesch, is a trustee for the JDL Trust, and appears in his representative capacity for said trust, which is the sole member of NNN Durham Office Portfolio 22, LLC.

23.

The plaintiffs, James K. Merrill and Muriel Sample, are trustees for the John Irvin Montgomery Trust, and appear in their representative capacities for the trust, which is the sole member of NNN Durham Office Portfolio 24, LLC.

6

24.

The plaintiff, C.G.B.M.T. Enterprises, Inc., is a Florida corporation which is the sole member of NNN Durham Office Portfolio 26, LLC.

25.

The plaintiff, Susan E. Wagner, is a natural person, and is the sole member of NNN Durham Office Portfolio 27, LLC.

26.

The plaintiff, Federic J. Van Dis, is a natural person, and is the sole member of NNN Durham Office Portfolio 28, LLC.

27.

The plaintiffs, Lawrence A. Wattson and Stephanie T. Wattson, are trustees for the Lawrence A. And Stephanie T. Watttson 2006 Trust, and appear in their representative capacities for said trust, which is the sole member of NNN Durham Office Portfolio 29, LLC.

28.

The plaintiff, DAS Unlimited, Inc., is a Florida corporation which is the sole member of NNN Durham Office Portfolio 30, LLC.

29.

The plaintiff, Kenneth Deno McLamb, is a natural person, and is the sole member of NNN Durham Office Portfolio 32, LLC.

30.

The plaintiff, Cynthia L. McLamb, is a natural person, and is the sole member of NNN Durham Office Portfolio 33, LLC.

7

31.

The plaintiffs, Mark B. Pista and Carol E. Pista, are natural persons, and are the sole members of NNN Durham Office Portfolio 34, LLC.

32.

The defendant, Highwoods DLF 98/29, LLC, is a Delaware corporation with its principal place of business in Raleigh, North Carolina. Highwoods DLF 98/29, LLC is the successor in interest of Highwoods DLF 98/29, L.P.

33.

The defendant, Highwoods DLF, LLC, is a Delaware corporation, and was the sole general partner of Highwoods DLF 98/29, L.P.

34.

The defendant, Highwoods Realty Limited Partnership, is a North Carolina limited partnership, and is the sole member of Highwoods DLF, LLC.

35.

The defendant, Highwoods Properties, Inc., is a Maryland corporation with its principal place of business in Raleigh, North Carolina, and is the sole general partner of Highwoods Realty Limited Partnership. Collectively the entities referenced in Paragraphs 32 through 35 will be referred to as the "Highwoods Defendants."

36.

The defendant, Thomas Linderman Graham, Inc., is a North Carolina corporation with its principal place of business in Raleigh, North Carolina.

8

37.

Plaintiffs are informed and believe that defendant, Grubb & Ellis|Thomas Linderman Graham was a partnership formed by Grubb & Ellis Company and\or Grubb & Ellis Affiliates, Inc. and the defendant, Thomas Linderman Graham, Inc. The basis for this belief is set forth in Paragraph 40.

38.

In the alternative, should it prove that Grubb & Ellis|Thomas Linderman Graham was not formally a partnership, Grubb & Ellis Company and\or Grubb & Ellis Affiliates, Inc. and Thomas Linderman Graham, Inc., represented that Grubb & Ellis|Thomas Linderman Graham was a partnership, and are estopped to deny the existence of the partnership.

39.

In the alternative, plaintiffs are informed and believe that a joint venture was created by Grubb & Ellis Company and\or Grubb & Ellis Affiliates, Inc. and Thomas Linderman Graham, Inc., and that business was transacted under the name of Grubb & Ellis|Thomas Linderman Graham.

40.

Defendant Grubb & Ellis|Thomas Linderman Graham's explains the relationship between itself, Defendant Thomas Linderman Graham, Inc. and the Highwoods defendants on it's website as of October 20, 2010 as follows:

Grubb & Ellis|Thomas Linderman Graham's roots date back to 1978 when Highwoods Properties was founded. J. Rex Thomas, CPM, SIOR, Chairman and CEO of Grubb & Ellis|Thomas Linderman Graham, was a partner at Highwoods Properties and helped to take the company public as a Real Estate Investment Trust in 1996. He then purchased its third-party services business, forming Thomas Commercial Inc.

John B. Linderman, Jr., SIOR, President of Grubb & Ellis|Thomas Linderman Graham, founded Vector Properties in 1994. In 1997, the company was among the

9

first in the nation to join the Grubb & Ellis affiliate program, becoming Grubb & Ellis|Vector. In 2000, Rex and John joined forces to form Grubb & Ellis|Thomas Linderman.

The late Frank H. Kenan created Graham Associates, Ltd. in 1993 in order to manage his commercial real estate portfolio. Jack Graham, Executive Vice President of Operations for Grubb & Ellis|Thomas Linderman Graham, joined Graham Associates in 1996, bringing to the company an extensive background in both real estate and banking. Initially a Kenan-based enterprise, Graham Associates grew to include a full range of commercial real estate services for a variety of clients.

As with most relationships that the principals at Grubb & Ellis|Thomas Linderman Graham have cultivated, the one between Rex, John and Jack spans years. Their collaboration began in the late 1990s. Graham Associates was instrumental in the development of One Park Drive in Research Triangle Park, and Grubb & Ellis|Thomas Linderman, then Thomas Commercial, was brought in to serve as leasing agent. It was immediately clear that the companies were driven by a shared philosophy and that further developing the relationship would be mutually beneficial. The process of bringing the two companies together began in mid-2003, and a merger was completed in early 2005, forming Grubb & Ellis|Thomas Linderman Graham.

A screen shot copy of the website is attached hereto as Exhibit A.

41.

Each plaintiff has the capacity and standing to prosecute this action.

42.

This court has jurisdiction over the subject matter of this action and the persons of defendants.

43.

Venue is proper in this court.

44.

This action was initiated within all applicable periods of limitations and repose.

10

45.

Plaintiffs have complied with all conditions precedent to the prosecution of this action.

## II. GENERAL ALLEGATIONS AS TO ALL PLAINTIFFS

46.

Highwoods DLF 98/29, L.P. owned property in Durham County, North Carolina. The property is located at 3414 Duke Street (Fairfield II), 4117 North Roxboro Road (Fairfield I), 3404 North Duke Street, 4101 North Roxboro Road , and 4020 North Roxboro Road, Durham, N.C., hereinafter collectively the "Subject Property."

47.

The five office buildings constituting the Subject Property are located near Durham Regional Medical Center, which is owned by Duke University ("Duke").

48.

Fairfield I, located at 4117 N. Roxboro Rd., is a four story, 51,295 square foot building located on 2.76 acres. It was constructed and completed in 1986 by a Durham developer, Gary M. Hoch ("Hoch").

49.

Fairfield II, located at 3414 Duke St., is a five story, 59,954 square foot building located on 3.14 acres. It was completed in 1989 by Hoch.

50.

3404 N. Duke St. is a two story, 67,000 square foot building located on 4.25 acres. It was

11

completed in 1984 by Hoch.

51.

4020 N. Roxboro Rd. is a two story, 42,080 square foot building located on 3.29 acres. It was completed in 1985 by Hoch.

52.

4101 N. Roxboro Rd. is a two story, 56,000 square foot building located on 4.27 acres. It was completed in 1989 by Hoch.

53.

The buildings were occupied by tenants in November, 2006. The Duke Health Care PRMO Group ("PRMO") occupied all four floors of Fairfield I; occupied the second floor of 3404 N. Roxboro Rd. as a sublessee of Qualex, Inc., and also occupied most of the fourth floor of that building; and occupied both floors of 4101 N. Roxboro Rd. Both floors of 4020 N. Roxboro Rd. were occupied by Duke Pediatrics. In total, Duke – related entities occupied 52% of the five-building portfolio.

54.

The PRMO, which is an acronym for Patient Revenue Management Organization, is responsible for managing the full revenue process for the faculty and physician practice groups within Duke's network and hospitals. As of November, 2006, it employed over 1,100 people and collected over $1.4 billion annually.

55.

Duke was, in 2006, the largest employer in Durham County.

56.

The PRMO leases and sublease in the Subject Property were set to expire in 2009 and 2010.

57.

Beginning at least as early as September, 2006, Duke was considering relocating the PRMO function from North Durham to the Research Triangle Park ("RTP").

58.

Duke retained a local company, Corporate Realty Advisors ("CRA"), to assist it in soliciting proposals from developers to construct a building in or near the RTP for the purpose of relocating the PRMO facility. CRA contacted developers, including the parent of Highwoods, seeking proposals for the relocation.

59.

Prior to September 12, 2006, CRA had met with Highwoods regarding the possibility of getting out of Duke's PRMO leases and doing a new deal with Highwoods. Highwoods indicated to CRA that they would be willing to build a 120, 000 to 150, 000 square foot building in Research Commons on a 12 year lease and let Duke out of their current obligations at the Subject Property two years early."

60.

By October 31, 2006, Duke and Highwoods had examined land for the purpose of a "build to suit" facility for the relocation of the PRMO. By that time, CRA had spent "dozens" of hours discussing the PRMO relocation with Highwoods. Also by this time, Highwoods had begun developing pro forma calculations for building a new building to house the PRMO in the Research

13

Triangle Area, a different geographic area in the Durham commercial real estate market than the North Durham area where the Subject Property is located. See Ex. C (Highwoods pro forma).

61.

At this time, Duke was also discussing the prospect of a build to suit facility with Hoch, the developer who had originally constructed and owned the buildings at the Subject Property. Highwoods, a sophisticated developer, knew that other developers would be competing for the PRMO relocation, and that Hoch, a Durham developer who had engaged in other transactions with Duke, would likely be one of its competitors for the PRMO relocation.

62.

Highwoods also knew, as of autumn 2006, that if the PRMO vacated the North Durham buildings, finding a comparable replacement tenant would be difficult if not impossible, and that the absence of that credit tenant would materially reduce the value of the buildings.

63.

Knowing that PRMO anticipated relocating, but also knowing that this information was not yet public, and cognizant of the consequences of the loss of a significant credit tenant, Highwoods decided to sell the buildings before their value decreased. It entered into an Exclusive Right to Sell Listing Agreement with Thomas Linderman Graham, Inc. ("TLG"). The agreement is undated but was executed by Mr. Linderman on October 24, 2006.

64.

The agreement contained a Dual Agency Addendum. Mr. Linderman signed that addendum on October 24, 2006. A copy of the agreement and addendum is attached as Ex. D.

14

65.

Because the Defendant, Grubb & Ellis | Thomas Linderman Graham was engaged as the exclusive agent for the sale of the Subject Property by the Defendant, Highwoods DLF 98/29, LLC's, predecessor Highwoods DLF 98-29, L.P., the Highwoods Defendants are therefore liable for acts and omissions of Grubb & Ellis | Thomas Linderman Graham.

66.

A.    False and Fraudulent Statements by Defendants in the November 2006 Grubb & Ellis | Thomas Linderman Graham Offering Memorandum.

67.

In connection with the sale of the Subject Property, Defendant, Grubb & Ellis | Thomas Linderman Graham, produced a Confidential Offering Memorandum in November 2006 (hereinafter the "Grubb & Ellis | Thomas Linderman Graham Memorandum"). A copy of the Grubb & Ellis | Thomas Linderman Graham Confidential Offering Memorandum is attached hereto as Exhibit E.

68.

The Grubb & Ellis | Thomas Linderman Graham Memorandum was intended to be, and was, provided to potential purchasers of the Subject Property. As set forth in detail below, the Grubb & Ellis | Thomas Linderman Graham Memorandum was provided directly to several of the Plaintiffs, their brokers, or their broker dealers in connection with the sale of the Subject Property. In addition, information in the Grubb & Ellis | Thomas Linderman Graham Memorandum which was material to all Plaintiffs' individual decisions to purchase the Subject Property was copied into a January 5, 2007 Memorandum provided to all of the Plaintiffs and/or their brokers by an entity related to Grubb & Ellis | Thomas Linderman Graham, Triple Net Properties, LLC. (hereinafter the "Triple Net

15

Memorandum" attached as Exhibit F). The relationship of Grubb & Ellis | Thomas Linderman Graham to Triple Net is alleged *infra* at ¶¶ 125-29.

69.

The Grubb & Ellis | Thomas Linderman Graham Memorandum contained false statements of material facts, including, but not limited to, the following: that the majority of the leases on the property would "rollover" in 2009 and 2010 with renewals at higher market rates; that the real estate market in Durham County was "dramatically improving"; that rents would increase in 2007 and 2008; and that the renewal probability for Fairfield I, Fairfield II, 3404 N. Duke St., and 4020 N. Roxboro was 75%, and the renewal probability for 4101 N. Roxboro was 90%. See Ex. E.

70.

At the very beginning of the document in the Executive Summary, the Grubb & Ellis | Thomas Linderman Graham Memorandum states that "Value-added opportunity exists as the majority of the portfolio will rollover in 2009 and 2010, allowing for renewals at the then market rate. Tightening market trends have been the norm in North Durham over the last five quarters, and rent rates will continue to increase as vacancy dives ever lower." Ex. E.

71.

The Grubb & Ellis | Thomas Linderman Graham Memorandum in numerous places, touts the "highly credible tenant roster and resulting positive income stream." Ex. E.

72.

The section entitled "Stability and Upside Opportunity" states:

The renewal of the majority of the space during 2009 and 2010 marks a terrific opportunity for the investor to take advantage of a dramatically improving Durham

16

market by renewing existing tenants at then market rates. With no set renewal rates, the leases are set up for the Owner to reap the rewards of a market with lower vacancy and improved market rates favorable to Landlord economies.

Ex. E. (Grubb & Ellis | Thomas Linderman Graham Memorandum.) The next representations in that section concern the Durham County real estate market in general. Defendants stated the real estate market in Durham County was "dramatically improving" and that rents would increase in 2007 and 2008. Ex. E.

73.

These statements were false and/or misleading because Defendants knew that Duke University was on the verge of entering a contract to lease specific new construction beginning in 2007 and that Highwoods was proposing to Duke that it relocate the PRMO to a new facility to be built by Highwoods in a different geographic area. These material facts were omitted from the Grubb & Ellis | Thomas Linderman Graham Memorandum.

74.

In the Grubb & Ellis | Thomas Linderman Graham Memorandum, the Defendants knowingly used false renewal probabilities of 75 to 90 percent for the Subject Property and built fraudulent projections on them, representing a prediction of the future that Defendants knew was false at the time it was published. Ex. E. The false renewal probabilities are consistent with many other representations in the Grubb & Ellis | Thomas Linderman Graham Memorandum concerning renewal by Duke University. See id.

75.

17

In the "Stability and Upside Opportunity" section, the Grubb & Ellis | Thomas Linderman Graham Memorandum also states that:

> The Offering benefits from a highly credible tenant roster and resulting positive income stream. Impressively, 90% of the tenant base is leased by credit companies including Duke University Health System (52% of the Portfolio plus 33,500 square feet in a recently added sublease of excess Qualex space), Qualex, Inc., a division of Kodak (34% of the Portfolio), and IBM (4%). Most of the Duke space was leased prior to 2002 and has undergone at least one renewal since that time.

Ex. E. This section is followed by two paragraphs extolling the virtues of the Duke University tenants and then concludes with the "Upside Opportunity" paragraph about "the renewal of the majority of the space during 2009 and 2010." Id.

76.

The "Impressive Leasing Momentum" section trumpets the strength of the North Durham market conditions, "due in large part to a lack of alternatives for tenants." Ex. E. The Executive Summary continues with the "Stability and Consistency" section, which states:

> The Portfolio's leasing history reflects great investment stability. During the last five years, the Offering has maintained an occupancy rate greater than 90%. In fact, the average occupancy during those years has been 93%, and it currently stands at 99%. This reflects the growth of the majority tenant, Duke University Health Systems and the appeal to smaller tenants such as IBM.

Id. After the Executive Summary, the Grubb & Ellis | Thomas Linderman Graham Memorandum contains a section describing each building and its tenants, highlighting Duke as a tenant. Id.

77.

The Grubb & Ellis | Thomas Linderman Graham Memorandum closes with a market study which states that, despite the slowing of leasing activity and the increase in new construction in the

18

Triangle market, "large blocks of space are becoming increasingly difficult to find... Limited leasing options combined with increased construction costs will accelerate the rate at which rents increase in 2007 and 2008." Ex. E. With respect to the North Durham submarket, it was "one of just three of the Triangle's 15 submarkets to post a vacancy rate below 10 percent. Activity has been minimal in the submarket in the last several months, due in large part to a lack of alternatives for tenants." Id. Also, "The North Durham office submarket is somewhat insulated from economic downturns due to its stable medical tenant base." Id.

78.

The unsuitability of the Subject Property for Duke University's future plans and the request for proposals meant that it was highly likely that Duke would not renew its leases and would leave the Subject Property at the expiration of the leases in accordance with its request for proposals. Defendants were aware that the actual likelihood of the tenant in the majority of the rented space renewing its leases in the Subject Property was significantly less than 75%.

79.

Defendants knew this, *inter alia*, because as of November 10, 2006, employees of Highwoods and Thomas Linderman had recalculated the valuation of the portfolio to reflect a 0% and 25% chance of Duke PMRO not renewing. A spreadsheet was then prepared comparing the 75% renewal (labeled as "our story") versus the more realistic percentages. An email was sent on November 10, 2006 from Jim McMillan of Thomas Linderman Graham which states in part:

> Gordon has asked me to compile further valuations on the portfolio that take into account factos that we now know may be a possibility. The most dramatic is the possibility that Duke may not renew. Obviously, our marketing "story" will be predicated on the assumption that they will as will our valuation guidance to potential

19

buyers. However, Gordon and I both agreed that this exercise is necessary should Duke begin looking for alternative space during our marketing process. In fact, we decided to take this one step further. If Duke were to announce to a buyer during due diligence that they were leaving (most likely would not happen) then we would be left wondering what the properties worth is." . . . What I have done is simply take the marketing scenario (75% renewal) and compare it with low buyer confidence in a Duke renewal (25% with added downtime) and a worst case scenario (0% renewal probability). Further, I input a range of values for the first two scenarios and one for the last. If the 0% renewal came into fruition then we would essentially be selling empty buildings and the valuation then becomes more comp oriented.

See Ex. G.

80.

The Memorandum omitted material facts, which were known to the Defendants, including but not limited to:

a.  the fact that developers and real estate owners, including the Defendants, were offering to lease other properties to the tenants of the Subject Property and actively competing with the Subject Property to lease property to the tenants of the Subject Property;

b.  the fact that Duke University had previously indicated that the space leased by Duke for the Duke PRMO was not suitable for some of the uses;

c.  the fact that Duke University had previously indicated that the labor market of Duke University's employees and potential employees was shifting to the Cary/Apex area and thus, the North Durham region was not as suitable of a location for its labor pool as other areas, such as the Research Triangle Park area;

d.  the fact that as result of the lack of suitability of the space, Duke had expressed an inclination to obtain more suitable space elsewhere;

e.  the fact that Duke University had circulated a request for proposals;

f.  the fact that there was a very substantial probability that Duke University would not renew its lease in the Subject Property for the Duke PRMO; and

20

g.  the fact that Defendants were submitting a bid pursuant to Duke University's request for proposals at the very same time that they were marketing the property for sale.

## 81.

Rather than disclose the facts that Duke University had already issued a request for proposals for a build to suit building to move into at the end of the leases on the Subject Property and that they were in the process of submitting a proposal for a new building to Duke University, Defendants knowingly and intentionally made the misleading statements and false projections in the Grubb & Ellis | Thomas Linderman Graham Memorandum as alleged *supra* in paragraphs 69-81 and also separately on several occasions as alleged *infra*. The purpose of these misleading statements and false projections were to sell the Subject Property immediately before the Duke University leases expired.

## 82.

On or about December 6, 2006, Highwoods submitted a formal proposal to Duke University to build to suit new facilities to house the Duke PMRO unit.

## 83.

After circulating the Grubb & Ellis | Thomas Linderman Graham Memorandum from November 2006 through the closing of the property in March 2007, Plaintiffs are unaware of any steps taken by any of the Defendants to correct the false statements and material omissions contained therein. Defendants never qualified the false statements, never altered them, and never pulled them back. Instead, Defendants continued to use the false statements and material omissions for marketing the Subject Property until the closing date, and reiterated them on several key occasions,

21

as set forth *infra*.

84.

Defendant Grubb & Ellis | Thomas Linderman Graham published and circulated the Grubb & Ellis | Thomas Linderman Graham Memorandum with the understanding and intent that potential purchasers of the Subject Property, including but not limited to the Plaintiffs, would rely on it.

85.

Defendant Grubb & Ellis | Thomas Linderman Graham knew or should have known that the false statements and material omissions contained in the Grubb & Ellis | Thomas Linderman Graham Memorandum were being republished in other materials relied on by Plaintiffs. Defendants knew the structure of the investment vehicle and knew or should have known the fact that Triple Net Properties repeated the false statements and omissions from its own materials as alleged in paragraphs 102 through 109. As set forth in Paragraphs 201 and 222, when one Plaintiff and one Plaintiff's agent personally discussed with Defendant Grubb & Ellis | Thomas Linderman Graham the future of Duke University as a tenant, employees and agents of Grubb & Ellis | Thomas Linderman Graham orally reiterated the false statements and material omissions contained in the Grubb & Ellis | Thomas Linderman Graham Memorandum.

B.    The Selection of Triple Net as the Purchaser.

86.

In response to the Grubb & Ellis | Thomas Linderman Graham Memorandum, on December 21, 2006, Mr. Jim McMillan (hereinafter "McMillan") of Defendant Grubb & Ellis | Thomas Linderman Graham received a proposal to purchase the property signed by Danny Prosky on behalf

22

of Triple Net Properties, LLC (hereinafter "Triple Net"). See Ex. I. The proposal listed a purchase price of $34,200,000.00 and indicated that Triple Net "intends to raise equity through our Tenant-in-Common ("TIC") platform." Ex. I.

87.

Prior to December 21, 2006, Triple Net had submitted an initial bid of $32,800,000. On December 19, 2007, Triple Net was notified by included in the invitation to submit a best and final bid. In response, on December 20, 2006, Brian McDonald of Triple Net asked McMillan in an email if there was any reason that Duke University had not negotiated previously for renewal options at below market rates. McMillan replied that there was no reason that the Defendants knew of. See Ex. J. McMillan's response was knowingly false because Defendants knew that Duke PMRO intended to leave at the end of the lease and that the Highwoods Defendants had already submitted a formal proposal to Duke University to build new facilities in the Triangle Park area to lease to the Duke PMRO group, a different geographic area than the North Durham location of the Subject Properties.

88.

Additionally, in his December 20, 2006 email, Brian McDonald of Triple Net asked McMillan how much assurance could be given that Duke would not previously expand to the point of vacating the entire premises for a new building upon lease expiration. McMillan replied as follows:

> The assurance we can give is based on conversations with the real estate head. They have recently subleased the top floor of 3404 Duke Street from Qualex. They are only about 1/2 staffed now after 4 months. They overleased intentionally so that they could grow into that space over time. We were told that that was the last of the

23

expansions that they will need for the foreseeable future. PRMO has 800 employees in this location and most live within 3-5 miles. They are very sensitive to not moving out of convenience for their employees and their access. These properties work very well in that regard and that is the reason that they have been in this location for so long and decided to grow into this location versus elsewhere. Very good amenities within walking distance and plenty of parking.

See Ex. J. McMillan's response failed to disclose to Brian McDonald Defendants' knowledge that Duke PMRO intended to leave at the end of the lease and that the Highwoods Defendants had already submitted a formal proposal to Duke University to build new facilities in the Triangle Park area to lease to the Duke PMRO group.

89.

On or around December 17, 2006, McMillan received a calculation of the value of the Subject Property which valued the Subject Property with the uncertainty of Duke renewing at $20,145,000. See Ex. K.

90.

On or around December 22, 2006, knowing that Triple Net intended to fund its bid through the tenant in common mechanism, Defendants through McMillan informed Triple Net that it had been chosen as the purchaser. In so doing, Defendants chose Triple Net to act as a promoter or sponsor to market and sell shares of the Subject Property as a security to tenants in common (hereinafter "TIC" or "TICs") in a tenant in common 1031 transaction.

24

## C. The Tenant in Common (TIC) Investment Structure

### 91.

At this time, the TIC form was popular for investors seeking IRS Section 1031 exchanges. Triple Net, a subsidiary of NNN Realty Advisors, Inc., was at the forefront of TIC investments, and at the time the deal took place, Triple Net was the largest sponsor of tenant in common 1031 exchange investors.

### 92.

A 1031 transaction allows a real estate investor to avoid paying capital gains on the sale of investment real property by placing the proceeds of the sale with a qualified intermediary. The investor then has 45 days to identify a new property that the investor intends to purchase with the prior investment proceeds, and 180 days to close on the sale of the new property.

### 93.

This transaction structure became popularized after IRS Rev Proc. 2002-22, where the IRS determined that undivided fractional ownership in investment property could satisfy the requirements for a 1031 exchange. IRS Rev Proc. 2002-22 allowed investors to purchase a fractional interest in the property and still satisfy 1031 exchange guidelines, making it significantly easier for an investor to identify a property for purchase within 45 days of the sale of their previous property.

### 94.

Founded in 1998, NNN Realty Advisors was one of the largest sponsors of securitized TIC transactions. At the time of the sale, NNN Realty Advisors publicly estimated on an internet website

25

that it controlled 13.6% of the total securitized TIC market. In addition, Triple Net Properties publicly stated to be one of the founders of the TIC 1031 industry and played a significant role in helping securitized TICs emerge as a viable investment vehicle.

95.

Defendants knew that any agreement or arrangement with Triple Net or NNN Realty Advisors would result in a sale of the properties to investors in a TIC arrangement.

96.

In a TIC sale, the sponsoring entity assembles the initial Tenant in Common offering and distributes it to broker dealers for sale by brokers to purchasers. A TIC sponsoring entity is usually a trust subsidiary, real estate investment company or entrepreneur. The sponsor will identify the property, perform a significant amount of due diligence, enter into the purchase and sale agreement, arrange financing and sell the TIC interests to investors as a package deal. TIC owners often have different percentage interests, and each is entitled to their pro rata share of the property's net income. Each TIC owner has a separate deed, reflecting his or her unique ownership interest in the property.

97.

Because of the nature of these transactions, the SEC has clarified that TIC style transactions such as the one employed in this case are, in fact, securities within the meaning of Section 2(a)(1) of the Securities Act of 1933. See, e.g., Exhibit L. (January 29, 2009 Response Letter from the SEC). Thus, they are recognized as securities requiring registration or exemption with the SEC and the North Carolina Secretary of State.

98.

26

In connection with the sale of the Subject Property, Triple Net Properties, LLC formed a corporation, NNN Durham Office Portfolio, LLC, to acquire the Subject Property through a TIC real estate syndication. As part of the syndication, investors would either buy a fractional interest in NNN Durham Office Portfolio, LLC or purchase a fractional interest in the property by forming another limited liability corporation (LLC) which purchased a fractional share. The individual Plaintiffs in this action each formed a LLC and purchased a fractional share.

99.

Each of the LLC Plaintiffs were required by Triple Net Properties, LLC to enter into a tenants in common agreement in order to purchase the fractional shares of the property. Thus, the Limited Liability Companies were then tenants in common with each other. Each of the Limited Liability Companies listed as a Plaintiff in this action were created expressly for the purpose of purchasing the Subject Property through the aforesaid syndication.

100.

In conjunction with its solicitation of the Plaintiffs and other potential investors for this transaction, on February 2, 2007, NNN Durham Office Portfolio, LLC filed a Form REGDEX - Notice of Sale of Securities with the Securities and Exchange Commission, which was accepted on February 6, 2007. See Ex.M. In addition, upon information and belief, exemption documents were filed with the North Carolina Secretary of State pursuant to the requirements of Chapter 78A. The basis for this belief is the statements made in the offering documents provided to the Plaintiffs soliciting their participation in the transaction. The offering documents also contain the common

27

disclaimer required for the offering of securities in a private placement:

> THE INTERESTS OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATES AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF SAID ACT AND SUCH LAWS. THE INTEREST IS SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER SAID ACT AND SUCH LAWS PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. THE INTEREST HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THE ADDENDUM OR THE MEMORANDUM, ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

101.

For TIC 1031 investments, the industry practice is that the sponsor is expected to perform due diligence on the transaction before offering it to potential TICs. On one or more occasions. Triple Net publicly stated that for all of their deals, they customarily sent out an acquisition team who performed exhaustive due diligence on all deals including: environmental; engineering; location; local economy; and speaking with each tenant.

D.    The January 5, 2007 Memorandum by Triple Net

102.

In connection with the recruitment of Plaintiffs as TICs in the purchase of the Subject Property, Triple Net Properties, LLC produced a Confidential Private Placement Memorandum. hereinafter the "Triple Net Memorandum." Ex. F. The Triple Net Memorandum is accompanied by an Addendum of the same date.

28

103.

With respect to the intentions of Duke University and other key issues, Triple Net did not conduct any due diligence review prior to the publication of the January 5, 2007 Triple Net Memorandum. Specifically, Triple Net did not interview any official from Duke University concerning its future intent until a meeting conducted on January 19, 2007.

104.

The Plaintiffs are informed and believe that the Triple Net Memorandum was provided to other potential purchasers of the Subject Property in a TIC syndication by Triple Net Properties, LLC. The basis of this belief is the fact that some of them received investor packages with numbers significantly higher than the ultimate number of investors who purchased an interest in the Subject Property.

105.

All Plaintiffs received a copy of the Triple Net Memorandum prior to the closing of the purchase transaction in March 2007.

106.

The Triple Net Memorandum is based in large part on the Grubb & Ellis|Thomas Linderman Graham Memorandum and repeats verbatim many of its representations therein concerning the Subject Property. The Triple Net Memorandum specifically cites Grubb & Ellis as the source of information contained in it on pages 39 and 41, mirroring the language identically or almost identically in many places, and stating that the "[t]his Business Plan contains information researched by the Manager (Triple Net), some of which was prepared by Grubb & Ellis|Thomas Linderman

29

Graham. . ." Ex. F.

107.

The Triple Net Memorandum repeated the false statements of material facts contained in the Grubb & Ellis|Thomas Linderman Graham Memorandum, including, but not limited to, the following: that the major tenants, Duke University and Duke University Health Systems, Inc., hereinafter collectively "Duke", would likely continue to renew each of their leases; and that the renewal probability for Fairfield I, Fairfield II, 4101 N. Roxboro, and 4020 N. Roxboro was 75%, and the renewal probability for 3404 N. Duke St. was 50%. The adjustment downward from the Grubb & Ellis | Thomas Linderman Graham Memorandum's probability estimates appears to account for the nonrenewal of Qualex, Inc., which was going out of business.

108.

The Triple Net Memorandum omitted the same material facts concerning the Subject Property as the original Grubb & Ellis|Thomas Linderman Graham Memorandum, including, but not limited to, the facts that developers and real estate owners were offering to lease other properties to the tenants of the Subject Property and actively competing with the Subject Property to lease property to the tenants of the Subject Property, that the space leased by Duke University for the Duke PRMO was not suitable for some of its uses, that the labor market for Duke University was shifting to the Cary/Apex area, that as a result of the lack of suitability of the space, Duke University had issued a request for proposals for a "build to suit" building to move into at the expiration of the leases on the Subject Property, that it was highly likely that Duke University would not renew its leases and would leave the Subject Property at the expiration of the leases, and that the Defendants

30

had submitted a proposal for a build to suit building to Duke University in the Research Triangle Area at the same time they were selling the Subject Property to Plaintiffs through the TIC Structure.

109.

As alleged for each individual Plaintiff, *infra*, all of the Plaintiffs relied on the false information conveyed to them from the Defendants through the Triple Net Memorandum concerning Duke University's future in the Subject Property. Some of the Plaintiffs also received this false information from the Grubb & Ellis|Thomas Linderman Graham Memorandum directly, and still others also received the false information in oral statements made by employees of the Thomas Linderman Defendants or Triple Net based on the Grubb & Ellis|Thomas Linderman Graham Memorandum.

E.   "Due Diligence" Period.

110.

Despite the acceptance of Triple Net's offer conveyed on December 22, 2006, the Defendants' Purchase and Sale Agreement with Triple Net is dated "as of" January 24, 2007. The document on its face appears to give Triple Net one day to conduct due diligence. A copy of this Agreement is attached as Exhibit N. The agreement called for a closing date within 45 days of signature.

111.

On or around January 5, 2007, Highwoods began to give Triple Net documentation for due diligence purposes and set up a series of meetings with Triple Net employees and potential investors. On January 8, 2007, Triple Net confirmed its receipt of the due diligence documents it had requested, triggering the commencement of a 15 day due diligence period as contained in the Triple Net Offer, Ex. I.

31

112.

On January 10, 2007, the Highwoods Defendants, through David Linder, Senior Director of Leasing and Operators, offered to assume the lease obligations on the Subject Property "in the event a building is constructed by Highwoods and occupied by Duke." Ex. O. Defendants did not disclose this letter or the offer to assume the leases to Triple Net or any Plaintiff prior to the closing of the sale of the Subject Properties on March 12, 2007.

113.

In the Grubb & Ellis|Thomas Graham Linderman Offering Memorandum, Defendants had required that any recipient thereof obtain its prior permission to speak with any of its tenants. Ex. E. Plaintiffs did not obtain permission to speak with Duke University officials. During the due diligence process, Defendants insisted that they be present at any meetings with Duke University officials and Triple Net.

114.

The only meeting known to Plaintiffs which occurred between Triple Net employees and Duke University officials during this period occurred on January 19, 2012. Mike Waddell of Triple Net met with Scott Selig from Duke University. McMillan and the Highwoods Property Manager, Charles Ostendorf, were present at the meeting, as well as David Lindner. At the time, Triple Net had already completed the PPM and had distributed it to brokers for sale to potential customers.

115.

32

In that meeting, Waddell told Selig that he represented the buyer of the buildings, and that the buyer intended to complete the transaction. Selig understood the meeting as a courtesy, "get to know you" meeting. Neither Lindner, Selig, or any representative of Defendants present revealed that Highwoods was making a build to suit proposal to Duke.

116.

After the meetings with the tenant representatives, Charles Ostendorf completed the tours of the buildings with Mike Waddell of Triple Net without McMillan. During that tour, Mike Waddell asked Charles Ostendorf if he thought Duke would move. According to Mr. Ostendorf's email documenting the tour, "I replied that as frugal as they were I did not see it if the owner presented them with a very economical long term deal and perhaps gave them some space planning dollars. I did not see them as willing to pay the premium for new space." See Ex. P (Jan. 21, 2007 Email of Charles Ostendorf).

117.

This statement was knowingly false. On Friday September 8, 2006, Charles Ostendorf memorialized a discussion with John Stubbs of Corporate Realty Advisors, the real estate agent for Duke PRMO, in which "John Stubbs emphasized to Kristine that Duke PRMO would only be there until 2009 and then they would be moving to a new building which would house all of PRMO under one roof." Ex. Q (Friday, September 8, 2006 Email of Charles Ostendorf.)

118.

33

The "due diligence" conducted by Triple Net was successfully controlled and manipulated by Defendants with respect to any questions to Duke University concerning its intentions. As alleged supra. Defendants knowingly withheld material facts from Triple Net and made false reassurances to Triple Net before and after the meeting of Mr. Waddell and Mr. Selig, and as a result, lulled Triple Net into not further questioning or investigating the true intentions of Duke University prior to the closing.

119.

On or before February 19, 2007, Highwoods was informed by Duke that its property on T.W. Alexander Drive in the Research Triangle Area was one of the two finalists for the new build to suit PRMO. This fact was not disclosed to any of the Plaintiffs by Highwoods. Nor have Plaintiffs discovered any indication to date that it was ever disclosed to Triple Net.

120.

None of the Plaintiffs were contacted to enter into this transaction prior to January 5, 2007 and many were not contacted until February 2007. Thus, due to the time sensitive nature of the transaction and the closing dates, Plaintiffs were given a very limited time frame in which to consider the investment. As alleged *infra*, some Plaintiffs were given as little as a day or two to make their decision to invest.

F.    Closing of the Transaction And Subsequent History of the Subject Property

121.

34

The sale of the Subject Property did not take place in two stages from Highwoods DLF 98/29 L.P. to Triple Net and then from Triple Net to the TICs as was originally represented to the Plaintiffs. Instead, the TIC interests were sold directly from Highwoods DLF 98/29 L.P.

### 122.

The sale of the Subject Property from Defendant Highwoods to the Plaintiffs was settled on or about March 12, 2007. A deed was then recorded in the Durham County Registry deeding the title to the Subject Property from Defendant Highwoods, L.P. to Plaintiffs and other entities as tenants in common, which is attached as Exhibit R.

### 123.

The vast majority of the tenants, including and especially Duke University, did not renew their leases, and moved out of the property. The real estate market in Durham County has not improved, and the rents have decreased due to the non-renewal of the leases. As a result, on or around October, 2011, the property was sold in a foreclosure action. Because of the foreclosure, each of the Plaintiffs lost all of their investment in the Subject Properties as alleged individually by Plaintiff *infra*.

### 124.

As a result of Defendants' acts and omissions as stated above, each of the Plaintiffs has been damaged in excess of $10,000.00.

G.    Merger of Triple Net and Grubb & Ellis.

### 125.

At the time they decided to make the investment, none of the Plaintiffs knew or had any reason to know that Triple Net had not engaged in a full and proper due diligence commonly

35

performed by sponsors in a TIC arrangement. Nor did any Plaintiffs know or have reason to know that Triple Net had not confirmed the statements conveyed to it from Defendants concerning the renewal intention of Duke University.

126.

Unbeknownst to Plaintiffs, in January through March of 2007, Triple Net was in the process of merging with an entity affiliated with the seller's agent, Grubb & Ellis, Inc. This fact was not disclosed to the Plaintiff TIC investors by any Defendants or parties to the merger.

127.

On May 22, 2007, seventy days after the sale of the Subject Property to the plaintiffs, Triple Net's parent NNN Realty and Grubb & Ellis, Inc. announced that they would be merging, and offered the following details of the merger in a press release:

- Grubb & Ellis Inc. (NYSE:GBE) agreed to merge with privately held NNN Realty Advisors Inc. to form a publicly-traded real estate services company with a total capitalization of approximately $725 million.

- Under the merger agreement, Grubb & Ellis will issue 0.88 shares of common stock for each share of common stock held by NNN Realty Advisors shareholders. The combined entity will keep the Grubb & Ellis brand and continue to have its shares traded on the NYSE under the "GBE" ticker symbol.

- Following the merger, NNN Realty Advisors stockholders will own approximately 59% of the combined company while Grubb & Ellis stockholders will own approximately 41%.

- Scott D. Peters, president and CEO of NNN Realty Advisors, will become CEO of the combined entity, which will be headquartered in Santa Ana, CA, where NNN is based.

- Peters will also join the company's board of directors, which will be increased to nine members, with six nominees from NNN Realty Advisors and three from Grubb & Ellis.

- Anthony W. Thompson, founder and Chairman of the Board of NNN Realty Advisors, will join Grubb & Ellis as Chairman of the Board. C. Michael Kojaian,

36

currently Chairman of the Board of Grubb & Ellis, will remain on the board of the new Grubb & Ellis.

128.

As the seller's agent and sponsor announced the full details of their merger 70 days after the transaction, at the time of the transaction Triple Net and Defendant Grubb & Ellis|Thomas Linderman Graham were not at arms length during the transaction, but were related entities.

129.

The fact that Triple Net and Defendant Grubb & Ellis|Thomas Linderman Graham were becoming related entities through this merger was a material fact omitted and withheld from the Plaintiff TICS prior to the closing of this transaction.

H.  <u>March 12, 2010 Wake County Civil Action by Triple Net Against Defendant.</u>

130.

On or about March 12, 2010, Triple Net Properties, LLC and NNN Durham Office Portfolio, LLC filed an Application for an Order Extending Time to File Complaint action against Highwoods DLF 98/29, L.P., Highwoods DLF, LLC, Highwoods Realty Limited Partnership, Highwoods Properties, Inc., Highwoods Management, LLC, Committee, LLC, Schweiz-Deutschland-USA-Dreilander Beteiligung Objekt-DLF-98/290-Walter Fink-KG, and Thomas Linderman Graham, Inc. in the Wake County Court, under case number 10 CVS 004541. This Application is attached hereto as Ex. S.

131.

In the March 12, 2010 Application, the Triple Net Plaintiffs alleged that:

37

Defendants made material misrepresentations and/or omissions regarding whether certain tenants holding lease agreements at the Property would renew their existing lease agreements upon expiration. Upon information and belief, Defendants knew or should have known that these representations to Plaintiffs were false, and that Plaintiffs would in fact rely upon these representations to their detriment. . . .

132.

In the March 12, 2010 Application, the Triple Net Plaintiffs further stated:

An action will be brought against all Defendants and will at least include, but not be limited to the following claims for negligent misrepresentation, fraud, unfair and deceptive trade practices, agency, respondeat superior, and punitive damages.

Ex. S.

133.

The "Property" referred to in the March 12, 2010 Application is the same property that is involved in this action. Exhibit S, *inter alia*, evidences that the Defendants in this action were the source of the false statements in the Triple Net Memorandum, which were also repeated orally to Plaintiffs and their brokers by employees of Grubb & Ellis|Thomas Linderman Graham and Triple Net employees.

## III. INDIVIDUAL ALLEGATIONS BY PLAINTIFF

A. NNN Durham Office Portfolio I, LLC & James Osmond

134.

Plaintiff James Osmond invested $347,870.00 in the Subject Property through a qualified intermediary, Buyers North America Exchange, as a 1031 exchange.

135.

When originally contacted by his broker concerning this investment, Mr. Osmond's broker

38

advised him that Triple Net required a commitment to invest within one day of receiving the Triple Net Memorandum.

### 136.

Mr. Osmond's decision to invest in the Subject Property was based upon the fact that Duke University was a "credit tenant" at the Subject Property and the assurances that Duke University was very likely to re-new its leases. These assurances were contained in the Triple Net Memorandum to Mr. Osmond as a potential investor, which was provided to Mr. Osmond on or about January 10, 2007. During this time period, Mr. Osmond's broker also reiterated these assurances based on the Triple Net Memorandum.

**B.    NNN Durham Office Portfolio 2, LLC & James Sun Yu Lam**

### 137.

Plaintiff James Lam invested $227,795.00 in the Subject Property through a qualified intermediary for a 1031 exchange.

### 138.

Mr. Lam's decision to invest in the Subject Property was based upon the fact that Duke University was a "credit tenant" at the Subject Property and the assurances that Duke University was very likely to re-new its leases. These assurances were contained in the Triple Net Memorandum, and provided to Mr. Lam on or about January 13, 2007.

### 139.

Mr. Lam received these representations in Waipahu, Hawaii.

**C.    NNN Durham Office Portfolio 3, LLC & Gary F. Turtle**

39

Mr. Turtle invested a total of $174,930.85 in the Subject Property through a qualified intermediary for a 1031 exchange.

141.

Mr. Turtle's decision to invest in the Subject Property was based upon the fact that Duke University was a "credit tenant" at the Property and the assurances that Duke University was very likely to re-new its leases. These assurances were contained in the Triple Net Memorandum and provided to plaintiff in January 2007. During this time, these assurances were also orally conveyed by John Wilkins, Sr. of Triple Net, who stated that it was almost certain that Duke was going to renew its leases.

142.

Mr. Turtle received these representations in Sarasota, Florida.

D.    NNN Durham Office Portfolio 4, LLC & Sherry L. Turtle

143.

Mrs. Turtle invested a total of $174,930.85 in the Subject Property through a qualified intermediary for a 1031 exchange.

144.

Mrs. Turtle's decision to invest in the Subject Property was based upon the fact that Duke University was a "credit tenant" at the Property and the assurances that Duke University was very likely to re-new its leases. These assurances were contained in the Triple Net Memorandum and provided to plaintiff in January 2007. During this time, these assurances were also orally conveyed

by John Wilkins, of Triple Net, who stated that it was almost certain that Duke was going to renew its leases.

### 145.

Mrs. Turtle received these representations in Sarasota, Florida.

E.  NNN Durham Office Portfolio 5, LLC & Gregory R. Maloney

### 146.

Plaintiff Gregory R. Maloney invested a total of $477,505.45 in the Subject Property through a qualified intermediary for a 1031 exchange.

### 147.

Mr. Maloney's decision to invest in the Subject Property was based upon the fact that Duke University was a "credit tenant" at the Property and the assurances that Duke University was very likely to re-new its leases. These assurances were contained in the Triple Net Memorandum and provided to plaintiff on or about January 19, 2007. During this time period, the plaintiff's broker, Robert Smith, also reiterated these assurances.

### 148.

Mr. Maloney received these representations in Portland, Oregon.

F.  NNN Durham Office Portfolio 6, LLC & Sharon I. Maloney

### 149.

Plaintiff Sharon I. Maloney invested a total of $477,505.45 in the Subject Property through a qualified intermediary for a 1031 exchange.

### 150.

41

Mrs. Maloney's decision to invest in the Subject Property was based upon the fact that Duke University was a "credit tenant" at the Property and the assurances that Duke University was very likely to re-new its leases. These assurances were contained in the Triple Net Memorandum and provided to plaintiff on or about January 19, 2007. During this time period, the plaintiff's broker, Robert Smith, also reiterated these assurances.

151.

Mrs. Maloney received these representations in Portland, Oregon.

G.    NNN Durham Office Portfolio 7, LLC & Ray Miller, Trustee and Patricia M. Miller, Trustee

152.

Plaintiff's Ray and Patricia Miller invested a total of $632,000.00 in the Subject Property through a qualified intermediary for a 1031 exchange.

153.

Mr. and Mrs. Miller's decision to invest in the Subject Property was based upon the fact that Duke University was a "credit tenant" at the Property and the assurances that Duke University was very likely to re-new its leases. These assurances were contained in the Triple Net Memorandum and provided to plaintiffs in January or February 2007. During this time period, Plaintiffs' broker, Robert Smith, the same broker that advised Plaintiffs Gregory R. Maloney and Sharon I. Maloney, also reiterated these assurances.

154.

Mr. and Mrs. Miller received these representations in Wilsonville, Oregon.

H.    NNN Durham Office Portfolio 9, LLC & PCL Property, LLC

42

155.

PCL Property, LLC invested $602,814.90 in the Subject Property through a qualified intermediary for a 1031 exchange.

156.

PCL Property, LLC's decision to invest in the Subject Property was based upon the fact that Duke University was a "credit tenant" at the Property and the assurances that Duke University was very likely to re-new its leases. These assurances were contained in the Triple Net Memorandum, which was provided to plaintiff in January or February 2007. During this time period, the assurance that there was a 75-90% likelihood of Duke renewing its leases was also orally conveyed to Manager Peter Larson by its broker Dustin Christopherson. Upon information and belief, this information was obtained from Defendant Grubb & Ellis|Thomas Linderman Graham. The basis for Plaintiffs' belief is that the only place that this 75%-90% likelihood of renewal appears is in the Grubb & Ellis|Thomas Linderman Graham Memorandum.

157.

PCL Property, LLC Manager Peter Larson received these representations in Maple Lake, Minnesota.

I.      NNN Durham Office Portfolio 10, LLC & Frances H. Keifer

158.

Plaintiff Frances Keifer invested $471,300.00 in the Subject Property through a qualified intermediary for a 1031 exchange.

43

159.

Ms. Keifer's decision to invest in the Subject Property was based upon the fact that Duke University was a "credit tenant" at the Property and the assurances that Duke University was very likely to re-new its leases. These assurances were contained in the Triple Net Memorandum, and provided to plaintiff in January or February 2007. During this time period, these assurances were also orally conveyed to her broker by Scott Mauer, an employee of Triple Net.

160.

Ms. Keifer received the representations and the documents in Alisa Viejo, California.

J.    <u>NNN Durham Office Portfolio 11, LLC & Frank A. Norman, Jr.</u>

161.

Plaintiff Frank Norman invested $503,093.43 in the Subject Property through a qualified intermediary for a 1031 exchange.

162.

Mr. Norman's decision to invest in the Subject Property was based upon the fact that Duke University was a "credit tenant" at the Property and the assurances that Duke University was very likely to re-new its leases. These assurances were contained in the Triple Net Memorandum, and provided to plaintiff in January 2007. During this time these assurances were also orally conveyed by Danny Prosky, an employee of Triple Net.

163.

44

Mr. Norman received these assurances in Belgrade, Montana.

K.  NNN Durham Office Portfolio 12, LLC & St. Kitts Investments, LLC.

164.

Plaintiff St. Kitts Investments, LLC invested $408,774.20 in the Subject Property through a qualified intermediary for a 1031 exchange.

165.

St. Kitts Investments, LLC's decision to invest in the Subject Property was based upon the fact that Duke University was a "credit tenant" at the Property and the assurances that Duke University was very likely to re-new its leases. These assurances were contained in the Triple Net Memorandum and provided to plaintiff in January or February 2007. During this time period, assurances that Duke was likely to renew its leases were also orally conveyed by their broker Bob Horning from his conversation with Damian Gallagher, an employee of Triple Net.

166.

St. Kitts Investments, LLC received these representations in Los Angeles, California.

L.  NNN Durham Office Portfolio 13. LLC & Fanny B. Blackwelder

167.

. Plaintiff Fanny B. Blackwelder invested $513,896.30 in the Subject Property through a qualified intermediary for a 1031 exchange.

168.

45

Ms. Blackwelder's decision to invest in the Subject Property was based upon the fact that Duke University was a "credit tenant" at the Property and the assurances that Duke University was very likely to re-new its leases. These assurances were contained in the Triple Net Memorandum and provided to plaintiff in January 2007. During this time, these assurances were also orally conveyed by Hugo Black, an employee of Triple Net, during a telephone call on January 31, 2007. Upon receipt of the Triple Net Memorandum, Plaintiff was also advised by her broker that Triple Net expected the property interests to be subscribted to quickly and they would need to make a decision immediately if they wished to purchase an interest in the Subject Property.

169.

Ms. Blackwelder received these representations in Concord, North Carolina.

M.     NNN Durham Office Portfolio 14, LLC & Barbara L. Davidson, Trustee

170.

Plaintiff Barbara L. Davidson invested $298,490.00 in the Subject Property through qualified intermediary for a 1031 exchange.

171.

Ms. Davidson's decision to invest in the Subject Property was based upon the fact that Duke University was a "credit tenant" at the Property and the assurances that Duke University was very likely to re-new its leases. These assurances were contained in the Triple Net Memorandum and provided to plaintiff in January or February 2007.

172.

Ms. Davidson received these representations in Bainbridge Island, Washington.

N.     NNN Durham Office Portfolio 15, LLC & Frederick J. Hornbacher, Trustee

46

173.

Plaintiff Frederick J. Hornbacher invested $240,298.79 in the Subject Property through a qualified intermediary for a 1031 exchange.

174.

Mr. Hornbacher's decision to invest in the Subject Property was based upon the fact that Duke University was a "credit tenant" at the Property and the assurances that Duke University was very likely to re-new its leases. These assurances were contained in the Triple Net Memorandum and provided to plaintiff in January 2007. During this time, these assurances were also orally conveyed by his broker based upon oral representations made by Damian Gallagher and Mike Waddell, Triple Net Employees.

175.

Mr. Hornbacher received these representations in Rancho Mirage, California.

O.   NNN Durham Office Portfolio 16, LLC & Roberta MacGregor Masson

176.

Plaintiff Roberta Masson invested $199,988.30 in the Subject Property through a qualified intermediary for a 1031 exchange.

177.

Ms. Masson's decision to invest in the Subject Property was based upon the fact that Duke University was a "credit tenant" at the Property and the assurances that Duke University was very likely to re-new its leases. These assurances were contained in the Triple Net Memorandum and provided to plaintiff in January or February 2007. During this time, these assurances were also orally

conveyed by her broker based upon oral representations made by Brian Coleman, a Triple Net Employee.

178.

Ms. Masson received these representations in Tiburon, California.

P.    NNN Durham Office Portfolio 17, LLC & William B. Wachter, II, Trustee

179.

Plaintiff William Wachter invested $301,710.55 in the Subject Property through a qualified intermediary for a 1031 exchange.

180.

Mr. Wachter's decision to invest in the Subject Property was based upon the fact that Duke University was a "credit tenant" at the Property and the assurances that Duke University was very likely to re-new its leases. These assurances were contained in the Triple Net Memorandum and provided to plaintiff on or about February 16, 2007. During this time, these assurances were also orally conveyed by his broker based upon the Triple Net Memorandum. Upon receipt of the Triple Net Memorandum, Plaintiff was advised by his broker that Triple Net was pushing everyone to move quickly and that the Subject Property was filling up quickly and was slated to close in early March 2007 and he had to commit immediately if there was any chance of him being accepted.

181.

Mr. Wachter received these representations on Maui, Hawaii.

Q.    NNN Durham Office Portfolio 18, LLC & Susan B. Wachter, Trustee

182.

· 48

Plaintiff Susan E. Wachter invested a combined total of $301,710.00 in the Subject Property through a qualified intermediary for a 1031 exchange.

183.

Mrs. Wachter's decision to invest in the Subject Property was based upon the fact that Duke University was a "credit tenant" at the Property and the assurances that Duke University was very likely to re-new its leases. These assurances were contained in the Triple Net Memorandum and provided to plaintiff in January or February 2007. During this time, these assurances were also orally conveyed by her broker based upon the Triple Net Memorandum. Upon receipt of the Triple Net Memorandum, Plaintiff was advised by her broker that Triple Net was pushing everyone to move quickly and that the Subject Property was filling up quickly and was slated to close in early March 2007 and she had to commit immediately if there was any chance of her being accepted.

184.

Mrs. Wachter received these representations on Maui, Hawaii.

R.    NNN Durham Office Portfolio 19, LLC & Pell/Cruz Investments, Inc.

185.

Plaintiff Pell/Cruz Investments, Inc. invested $758,500.00 in the Subject Property through a qualified intermediary for a 1031 exchange.

186.

Pell/Cruz Investments, Inc.'s decision to invest in the Subject Property was based upon the fact that Duke University was a "credit tenant" at the Property and the assurances that Duke University was very likely to re-new its leases. These assurances were contained in the Triple Net

49

Memorandum and provided to plaintiff in February 2007. During this time, these assurances were also orally conveyed by its broker, Mark Slavny, based upon the Triple Net Memorandum.

187.

Pell/Cruz Investments, Inc.'s agents, Ronald Pellitero and Ruben Cruz, received these representations in Miami Beach, Florida.

S.    NNN Durham Office Portfolio 20, LLC & Jack R. Brown

188.

Plaintiff Jack R. Brown invested $274,925.00 in the Subject Property through a qualified intermediary for a 1031 exchange.

189.

Mr. Brown's decision to invest in the Subject Property was based upon the fact that Duke University was a "credit tenant" at the Property and the assurances that Duke University was very likely to re-new its leases. These assurances were contained in the Triple Net Memorandum and provided to plaintiff in January or February 2007. During this time, these assurances were also orally conveyed by his broker based upon oral representations made by John Wilkins and Simon Brower, employees of Triple Net, as well as the Triple Net asset manager for the Subject Property.

190.

Mr. Brown received these representations in Parkland, Florida.

T.    NNN Durham Office Portfolio 21, LLC & Patricia A. Brown

191.

Plaintiff Patricia Brown invested $274,925.00 in the Subject Property through a qualified

50

intermediary for a 1031 exchange.

192.

Mrs. Brown's decision to invest in the Subject Property was based upon the fact that Duke University was a "credit tenant" at the Property and the assurances that Duke University was very likely to re-new its leases. These assurances were contained in the Triple Net Memorandum and provided to plaintiff in January or February 2007. During this time, these assurances were also orally conveyed by her broker based upon oral representations made by John Wilkins and Simon Brower, employees of Triple Net, as well as the Triple Net asset manager for the Subject Property.

193.

Mrs. Brown received these representations in Parkland, Florida.

U.  <u>NNN Durham Office Portfolio 22, LLC & Jack D. La Flesch, Trustee</u>

194.

Plaintiff D. La Flesch invested $ 249,946.10 in the Subject Property through a qualified intermediary for a 1031 exchange.

195.

Mr. La Flesch's decision to invest in the Subject Property was based upon the fact that Duke University was a "credit tenant" at the Property and the assurances that Duke University was very likely to re-new its leases. These assurances were contained in the Triple Net Memorandum and provided to Mr. La Flesch in early February, 2007. During this time, these assurances were also orally conveyed to him by his broker based upon oral representations made by Damian Gallagher, a Triple Net Employee.

51

196.

Mr. La Flesch received these representations in Las Vegas, Nevada.

V.   NNN Durham Office Portfolio 24, LLC, Muriel Sample, Successor Trustee & James K. Merrill, Successor Trustee

197.

Plaintiffs Successor Trustees Muriel Sample and James K. Merrill invested $476,667.75 in the Subject Property through a qualified intermediary for a 1031 exchange.

198.

Successor Trustees Muriel Sample and James K. Merrill's decision to invest in the Subject Property was based upon the fact that Duke University was a "credit tenant" at the Property and the assurances that Duke University was very likely to re-new its leases. These assurances were contained in the Triple Net Memorandum and provided to plaintiffs on or about January 29, 2007. During this time, these assurances were also orally conveyed to them by Mark Mercado, a Triple Net Employee.

199.

Successor Trustees Muriel Sample and James K. Merrill received these representations in Madera, California.

W.   NNN Durham Office Portfolio 26, LLC & C.G.B.M.T. Enterprises, Inc.

200.

Plaintiff C.G.B.M.T. Enterprises, Inc. invested $353,475.00 in the Subject Property through a qualified intermediary for a 1031 exchange.

201.

52

C.G.B.M.T. Enterprises, Inc.'s decision to invest in the Subject Property was based upon the fact that Duke University was a "credit tenant" at the Property and the assurances that Duke University was very likely to re-new its leases. These assurances were contained in the Triple Net Memorandum and the Grubb & Ellis|Thomas Linderman Graham Memorandum, which were both provided to plaintiff on or about February 10, 2007. In February 2007, these assurances were also orally conveyed to plaintiff's agent, Charles Garavaglia, by representatives of Grubb & Ellis|Thomas Linderman Graham that there was a ninety-five percent chance that Duke University would renew its lease. Upon receipt of the Triple Net Memorandum and the Grubb & Ellis|Thomas Linderman Graham Memorandum, Mr. Garavalia was advised that Triple Net required that Plaintiff commit to the purchase of the Subject Property within three days.

202.

Plaintiff's agent Charles Garavaglia received these representations in Highland, Michigan.

X. NNN Durham Office Portfolio 27, LLC & Susan E. Wagner

203.

Plaintiff Susan E. Wagner invested $502,742.00 in the Subject Property through a qualified intermediary for a 1031 exchange.

204.

Ms. Wagner's decision to invest in the Subject Property was based upon the fact that Duke University was a "credit tenant" at the Property and the assurances that Duke University was very likely to re-new its leases. These assurances were contained in the Triple Net Memorandum and provided to plaintiff on February 16, 2007. During this time, these assurances were also orally

53

conveyed by Corey Calvert, a Triple Net Employee, on February 16, 2007, who additionally advised Ms. Wagner that she had one week to commit to investing in the Subject Property.

205.

Ms. Wagner received these representations in Westminster, Colorado.

Y.    NNN Durham Office Portfolio 28, LLC & Frederic J. Van Dis

206.

Plaintiff Frederic Van Dis invested $243,190.80 in the Subject Property through a qualified intermediary for a 1031 exchange.

207.

Mr. Van Dis' decision to invest in the Subject Property was based upon the fact that Duke University was a "credit tenant" at the Property and the assurances that Duke University was very likely to re-new its leases. These assurances were contained in the Triple Net Memorandum and provided to plaintiff in February 2007. During this time, these assurances were also orally conveyed by Corey Guy, a Triple Net Employee.

208.

Mr. Van Dis received these representations in Roseburg, Oregon.

Z.    NNN Durham Office Portfolio 29, LLC, Lawrence A. Wattson, Trustee & Stephanie T. Wattson, Trustee

209.

Plaintiffs Lawrence A. Wattson, Trustee and Stephanie T. Wattson, invested $707,892.60 in the Subject Property through a qualified intermediary for a 1031 exchange.

210.

54

Mr. and Mrs. Wattsons' decision to invest in the Subject Property was based upon the fact that Duke University was a "credit tenant" at the Property and the assurances that Duke University was very likely to re-new its leases. These assurances were contained in the Triple Net Memorandum and provided to plaintiff in January or February 2007. During this time, these assurances were also orally conveyed by Greg Genovese, an employee of Triple Net, who stated that the chances of Duke University renewing the lease were excellent.

211.

Mr. and Mrs. Wattson received these representations in Burlingame, California.

AA.    NNN Durham Office Portfolio 30, LLC & Darrin A. Smith

212.

Plaintiff Darrin A. Smith invested a combined total of $ 353,475.00 in the Subject Property through a qualified intermediary for a 1031 exchange.

213.

Mr. Smith's decision to invest in the Subject Property was based upon the fact that Duke University was a "credit tenant" at the Property and the assurances that Duke University was very likely to re-new its leases. These assurances were contained in the Triple Net Memorandum and provided to plaintiff in January or February 2007. During this time, these assurances were also orally conveyed to him by his broker, Ellen Erenstein.

214.

Mr. Smith received these representations in Pembroke Pines, Florida.

BB.    NNN Durham Office Portfolio 32, LLC & Kenneth Deno McLamb

55

215.

Plaintiff Kenneth Deno McLamb invested $136,598.45 in the Subject Property through a qualified intermediary for a 1031 exchange.

216.

Mr. McLamb's decision to invest in the Subject Property was based upon the fact that Duke University was a "credit tenant" at the Property and the assurances that Duke University was very likely to re-new its leases. These assurances were contained in the Triple Net Memorandum and the Grubb & Ellis|Thomas Linderman Graham Confidential Offering Memorandum, both of which were provided to Mr. McLamb in January 2007. During this time, these assurances were also orally conveyed by Hugh Black, an employee of Triple Net. Mr. McLamb was advised by his broker that Triple Net required that he commit to invest within a few days of receipt of the Triple Net Memorandum in the Subject Property or he would loose the opportunity to do so.

217.

Mr. McLamb received these representations in Clinton, North Carolina.

CC.   <u>NNN Durham Office Portfolio 33, LLC & Cynthia L. McLamb</u>

218.

Plaintiff Cynthia L. McLamb invested $136,598.45 in the Subject Property through a qualified intermediary for a 1031 exchange.

219.

Mrs. McLamb's decision to invest in the Subject Property was based upon the fact that Duke University was a "credit tenant" at the Property and the assurances that Duke University was very

56

likely to re-new its leases. These assurances were contained in the Triple Net Memorandum and the Grubb & Ellis|Thomas Linderman Graham Confidential Offering Memorandum, which were both provided to Mrs. McLamb in January 2007. During this time, these assurances were also orally conveyed by Hugh Black, an employee of Triple Net. Mrs. McLamb was advised by her broker that Triple Net required that she commit to invest within a few days of receipt of the Triple Net Memorandum in the Subject Property or she would loose the opportunity to do so.

220.

Mrs. McLamb received these representations in Clinton, North Carolina.

DD. NNN Durham Office Portfolio 34, LLC, Mark B. Pista & Carol E. Pista

221.

Plaintiffs Mark B. Pista & Carol E. Pista invested a combined total of $399,976.60 in the Subject Property through a qualified intermediary for a 1031 exchange.

222.

Mr. and Mrs. Pista's decision to invest in the Subject Property was based upon the fact that Duke University was a "credit tenant" at the Property and the assurances that Duke University was very likely to re-new its leases. These assurances were contained in the Triple Net Memorandum and the Grub & Ellis|Thomas Linderman Graham Confidential Offering Memorandum, which were provided to Mr. and Mrs. Pista in January 2007. These assurances were also orally conveyed directly to the Pista's broker by representatives of Defendant Grub & Ellis|Thomas Linderman Graham when

57

the broker personally visited the Subject Property in or about February 2007 and was escorted around the property by representatives of Defendant Grub & Ellis|Thomas Linderman Graham.

223.

Mr. and Mrs. Pista received these representations in Wattsonville, California.

## IV. CAUSES OF ACTION

### COUNT ONE:
### FRAUD

224.

The allegations contained in paragraphs 1 – 223 of the Complaint are incorporated herein by reference and made a part of this Count of the Complaint.

225.

The Defendants, acting in concert, made false representations contained in the Grubb & Ellis | Thomas Linderman Graham Memorandum. In addition, they also made false representations in emails and orally, as alleged *supra*.

226.

The Defendants, acting in concert, concealed material facts in the Grubb & Ellis | Thomas Linderman Graham Memorandum and in their other representations. Defendants' intended that their false representations and material omissions reach potential purchasers of the Subject Property, including Plaintiffs, as shown *supra*.

58

## 227.

Agents of the Defendants orally repeated the above false representations directly to various Plaintiffs, omitted material facts from communication with Plaintiffs, and concealed material facts from various Plaintiffs and/or their agents, as specifically alleged *supra*.

## 228.

Defendants made these false representations and material omissions of fact with the intent that the false representations reach potential purchasers of the Subject Property, including Plaintiffs, as shown *supra*. The Defendants made statements in order to facilitate this purchase of the Subject Property as set forth above. The statements omitted material facts, contained false statements, and deliberately created a false impression. By their statements, and by their role in this transaction, and the sale of securities, Defendants created and owed a duty to correct the falsehoods and to tell the whole truth to the Plaintiffs. Defendants, in derogation of their duty, made the false representations and concealed the material facts with an intent to deceive potential purchasers of the Subject Property, including Plaintiffs, and the false representations and concealment of the material facts were reasonably calculated to deceive.

## 229.

As alleged individually by Plaintiffs *supra*, the Plaintiffs and each of them reasonably relied on the above pled false representations and concealment of material facts of the Defendants as conveyed to them and/or their brokers either through the Grubb & Ellis | Thomas Linderman Graham Memorandum, the Triple Net Memorandum, oral reiteration of the fraudulent misrepresentations and concealments contained in the Grubb & Ellis | Thomas Linderman Graham and Triple Net Memorandum by agents of Triple Net, or oral reiteration of the same by agents of Defendant, Grubb

59

& Ellis | Thomas Linderman Graham. Plaintiffs' reliance was reasonable because Defendants had made their false representations and concealments of material fact in published written materials subject to federal and/or state securities laws. In addition, it was reasonable for Plaintiffs and other individuals to rely on publications, emails and statements made by Defendant, Grubb & Ellis | Thomas Linderman Graham and its employees real estate brokers, who are regulated by the North Carolina Real Estate Commission and Plaintiffs, and who are prohibited by N.C. Gen. Stat. § 93A-6(a) from "making any willful or negligent misrepresentation or any willful or negligent omission of material fact" or "pursuing a course of misrepresentation or making of false promises through agents, advertising or otherwise." N.C. Gen. Stat. § 93A-6(a). It was reasonable to expect Defendants to follow the law and not make fraudulent misrepresentations and omissions of material fact because Plaintiffs had no prior information that Defendants had previously made such fraudulent misrepresentations or omissions of material fact in other instances and had no indication that Defendants had made fraudulent misrepresentations or omissions of material fact prior to the closing of the transaction. Finally, it was reasonable for Plaintiffs to receive Defendants' false representations and concealments of material fact as conveyed by the organizers of the TIC structure in their investment because it was consistent with industry standards at the time.

230.

In reasonable reliance upon these false representations, omissions of material fact, and concealments of material fact, each Plaintiff expended the sums alleged individually Plaintiff by Plaintiff *supra*.

60

231.

Plaintiffs have suffered injury in an amount in excess of $10,000.00 by loss of their entire investment in the amounts pled supra as the investment amount for each Plaintiff. Plaintiffs' damages include the loss of their entire investment, plus expected appreciation and profits, plus interest thereon, all in an amount in excess of $10,000 for each Plaintiff.

232.

The Defendant, Thomas Linderman Graham, Inc., is liable for the actions of the Defendant, Grubb & Ellis | Thomas Linderman Graham, for the reasons set forth in Paragraphs 36-40 above.

233.

The Defendant, Highwoods DLF 98/29, LLC, is liable for the actions of the Defendant, Grubb & Ellis | Thomas Linderman Graham, as Grubb & Ellis | Thomas Linderman Graham acted as the agent for the seller, Highwoods DLF 98/29, L.P., and Highwoods DLF 98/29, LLC is the successor entity of Highwoods DLF 98/29, L.P.

234.

The Defendant, Highwoods DLF, LLC, is liable for the actions of the Defendant, Grubb & Ellis | Thomas Linderman Graham, as it was the sole general partner of the seller, Highwoods DLF 98/29, L.P.

235.

The Plaintiffs are informed and believe that Defendant, Highwoods DLF, LLC, was used as a mere instrumentality or alter ego of the Defendant, Highwoods Realty Limited Partnership, as

61

Highwoods Realty Limited Partnership was the sole member of Highwoods DLF, LLC, and Highwoods DLF, LLC was used to commit a fraud on the Plaintiffs as stated above. For this reason, Defendant, Highwoods Realty Limited Partnership and its general partner, Highwoods Properties, Inc., are liable to the Plaintiffs for fraud.

## COUNT TWO
## FRAUD IN THE INDUCEMENT

### 236.

The allegations contained in paragraphs 1 – 235 of the Complaint are incorporated herein by reference and made a part of this Count of the Complaint.

### 237.

The Defendants made false representations with the intent that the false representations reach potential purchasers of the Subject Property, including Plaintiffs, as shown *supra*.

### 238.

The Defendants concealed material facts with the intent that the false representations and concomitant concealment of material facts reach potential purchasers of the Subject Property, including Plaintiffs, as shown *supra*.

### 239.

Agents of the Defendant, Grubb & Ellis | Thomas Linderman Graham, orally repeated the above false representations and concealments of material fact directly to various Plaintiffs and/or their agents, as specifically alleged *supra*.

62

240.

The Defendants made the false representations and concealed the material facts alleged supra with the intent to deceive the Plaintiffs and other potential investors. The false representations and concealment of the material facts were made with the intent to influence the Plaintiffs to purchase the subject real property.

241.

The inclusion of the false representations and concealment of the material facts in the Memorandum were calculated to deceive and did deceive the Plaintiffs. Based on these false representations and concealment of material facts, the Plaintiffs purchased the subject real property. The deed purchasing the Subject Property was filed with the Durham County Register of Deeds on March 13, 2007.

242.

Based on the fraud of the Defendants as set forth above, and the allegations *supra*, the Court should grant relief for Defendants' fraud in the inducement of the purchase of the Subject Property for their injuries. As pled supra, plaintiffs have suffered injury in an amount in excess of $10,000.00 by loss of their entire investment in the amounts pled supra as the investment amount for each Plaintiff. Plaintiffs' damages include the loss of their entire investment, plus expected appreciation and profits, plus interest thereon, all in an amount in excess of $10.000 for each Plaintiff.

63

COUNT THREE
CHAPTER 78A

243.

The allegations contained in paragraphs 1 – 242 of the Complaint are incorporated herein by reference and made a part of this Count of the Complaint.

244.

The real property was sold to each of the Plaintiffs as Tenants in Common directly from Highwoods DLF 98/29, L.P. The deed from Highwoods DLF 98/29, L.P. purchasing the Subject Property was filed with the Durham County Register of Deeds on March 13, 2007, see Ex. R., in an amount in excess of $35,000,000.00, including fees and commissions, by virtue of the transactions as alleged *supra*. All of the remaining Highwood Defendants are listed in the signature block of the deed. See Ex. R.

245.

The TIC interests are securities and their sale is subject to the Chapter 78A of the North Carolina General Statutes, the North Carolina Securities Act. Documents were filed with the Securities and Exchange Commission and the North Carolina Secretary of State seeking a private placement exemption for the transaction. The SEC has officially clarified that TIC investments such as this one are securities subject to the 1933 Securities Act. The offering documents presented to the Plaintiffs were in the format usually involved in a private placement of securities, as well as the legal disclaimers required by such. The fundamental nature of the TIC structure is a pooling and a profit

64

sharing arrangement from a common investment.  <u>See</u> N.C. Gen. Stat. § 78A-2(11).

246.

Defendants, acting in concert with each other and Triple Net, offered or sold securities to Plaintiffs by means of the above pled untrue statements of material fact and omissions of material facts.

247.

All of the purchasing Plaintiffs were unaware of the falsity of the untrue statements of material fact and the existence of the material facts omitted in Defendants' representations as pled above.

248.

Defendants are unable to meet their burden of proof that they did not know, and in the exercise of reasonable care could not have known, of the untruth or omission.  Defendants were in fact aware of or, in the alternative, could have discovered the untruths and omissions which they used in order to sell the securities to Plaintiffs.

249.

Pursuant to N.C. Gen. Stat. § 78-56(a), Defendants are liable to Plaintiffs who purchased their securities from Defendants, in law or in equity for the consideration paid for the security, together with interest at the legal rate from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security.

65

250.

Prior to the Subject Property being foreclosed, the Plaintiffs tendered and/or stood ready to tender the real property to the Defendants and rescind the transaction pursuant to N.C. Gen. Stat. § 78A-56(a)(2).

251.

Pursuant to N.C. Gen Stat. § 78A-56(c)(1) and (2), the Defendants and all of their employees and agents who participated in the dissemination of false information in connection with the offering and sale of the Subject Property are jointly and severally liable to the Plaintiffs for the purchase price of the Subject Property, together with interest from the date of purchase, costs of this action, and attorney's fees.

## COUNT FOUR
## UNFAIR AND DECEPTIVE TRADE PRACTICES

252.

The allegations contained in paragraphs 1 – 251 of the Complaint are incorporated herein by reference and made a part of this Count of the Complaint.

253.

In the alternative, should the Court find that Chapter 78A of the North Carolina General Statutes does not apply, or that Chapter 75 of the North Carolina General Statutes applies in any event, the Defendants committed unfair or deceptive acts or practices within the meaning of the North Carolina Unfair and Deceptive Trade Practices Act. N.C. Gen. Stat. § 75-1.1 et seq. The following acts constitute the Defendants' unfair and deceptive trade practices:

66

a. fraudulently inducing the purchase of real property by making false statements of material facts as shown above as part of the transaction resulting in the conveyance of real property in the deed filed with the Durham County Register of Deeds on March 13, 2007;

b. fraudulently inducing the purchase of real property by concealing and failing to disclose material facts as shown above;

c. by secretly attempting to persuade the tenants of the Subject Property to lease property belonging to the Defendants, or offered for lease by the Defendants, while representing to the Plaintiffs that the tenants would remain in the Subject Property;

d. committing acts prohibited by N.C. Gen. Stat. § 93A-6(a); and

e. Other acts and omissions.

254.

The Defendants' acts described above were in or affecting commerce.

255.

The Defendants' acts proximately caused injury, including lost profits, to Plaintiffs individually in excess of $10,000.00.

256.

The Defendants are therefore liable to Plaintiffs for actual damages, statutory treble damages, and attorney's fees under the North Carolina Unfair and Deceptive Trade Practices Act. N.C. Gen. Stat. §§ 75-1.1 et seq. (2003).

67

## COUNT FIVE
## NEGLIGENT MISREPRESENTATION

257.

The allegations contained in paragraphs 1 – 256 of the Complaint are incorporated herein by reference and made a part of this Count of the Complaint.

258.

The Defendant, Grubb & Ellis|Thomas Linderman Graham, made false statements in the Memorandum as set forth above. The Defendants made statements in order to facilitate this purchase of the Subject Property as set forth above. The statements omitted material facts, contained false statements, and created a false impression. By these statements, and by their role in this transaction, and the sale of securities, Defendants owed a duty to correct the falsehoods and to tell the whole truth to the Plaintiffs.

259.

In making these false statements, the Defendant, Grubb & Ellis|Thomas Linderman Graham, failed to exercise reasonable care to discover the truth or falsity of the statements contained in the Grubb & Ellis | Thomas Linderman Graham Memorandum and orally repeated by its employees and agents.

260.

The Defendant, Grubb & Ellis|Thomas Linderman Graham, by selling the Subject Property to a TIC syndicate assembled by a related entity, effectively precluded an investigation of the facts by the Plaintiffs by means of: (a) an agreement in the Grubb & Ellis|Thomas Linderman Graham Memorandum not to contact the tenants of the Subject Property without prior approval; (b) the use of

68

a very short timeframe within the TIC structure for Plaintiffs to make their decisions to invest; and (c) the use of the related entity which purported to do due diligence prior to seeking investors in the syndicate.

261.

The Plaintiffs justifiably relied to their detriment on the said false statements contained in the Memorandum, and thereby sustained damages in excess of $10,000.00 by purchasing the Subject Property, which deed purchasing the subject property was filed with the Durham County Register of Deeds on March 13, 2007.

262.

The Defendants, Highwoods Realty Limited Partnership, Highwoods DLF 98/29, LLC, Highwoods DLF, LLC, Highwoods Properties, Inc., and Thomas Linderman Graham, Inc. are liable for the negligent misrepresentations of the Defendant, Grubb & Ellis|Thomas Linderman Graham, for the reasons set forth in paragraphs 191-194 above which are incorporated into this Count by reference.

## COUNT SIX
## CIVIL CONSPIRACY

263.

The allegations contained in paragraphs 1 –262 of the Complaint are incorporated herein by reference and made a part of this Count of the Complaint.

264.

The Defendants combined, conspired, and agreed together to make misrepresentations of material facts and concealed material facts as set forth above.

69

265.

By virtue of their overt acts, the Defendants committed fraud, fraud in the inducement, negligent misrepresentation, and violated Chapter 78A and Chapter 75 of the North Carolina General Statutes. All as shown in Counts One through Five *supra*.

266.

By virtue of this civil conspiracy, the Defendants are each jointly and severally liable to the Plaintiffs for damages due to the civil torts listed above.

## COUNT SEVEN
## PUNITIVE DAMAGES

267.

The allegations contained in paragraphs 1 –266 of the Complaint are incorporated herein by reference and made a part of this Count of the Complaint.

268.

The tortious conduct by the Defendants toward the Plaintiffs involved fraud and willful or wanton conduct.

269.

The tortious conduct by the Defendants toward the Plaintiffs resulted in actual damages compensable to Plaintiffs.

70

270.

Pursuant to N.C. Gen. Stat. § 1D-1, punitive damages are appropriate in this case in order to punish the Defendants for egregiously wrongful acts and to deter them and others from committing similar wrongful acts.

271.

Pursuant to Chapter 1D of the North Carolina General Statutes. Defendants are individually liable to the Plaintiffs for punitive damages in an amount in excess of $10,000.00.

WHEREFORE, the Plaintiffs pray the Court as follows:

1.  For a trial by jury on all issues so triable.

2.  For compensatory damages and consequential damages in excess of $10,000.00, and that this amount be trebled pursuant to N.C. Gen. Stat. § 75-16.

3.  For punitive damages in excess of $10,000.00.

4.  For interest at the legal rate from the date of closing on the subject real property until this judgment is paid in full.

5.  In the alternative, that the Court order a rescission of the sale of the subject real property.

6.  For a reasonable attorney's fee to be allowed for the Plaintiffs.

7.  That the costs of this action be taxed to the Defendants.

8.  For such other and further relief as the Court deems mete and proper.

Respectfully submitted this the 6th day of July, 2012.

71

STARK LAW GROUP, PLLC

/s/ Thomas H. Stark

By:

Thomas H. Stark
State Bar No. 10052
6011 Farrington Road, Suite 300
Chapel Hill, North Carolina 27517
Telephone:     (919) 490-5550
Facsimile:      (919) 490-5551

72